## JOHN PHILIP HILL *v.* BOARD OF REGISTRY
### [No. 11, January Term, 1937.]

*Decided November 11th, 1936.*

654

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The cause was argued, as of the October, 1936, Term, before BOND, C, J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*John Philip Hill,* in pro. per.

*Charles T. LeViness, 3rd, Assistant Attorney General,* for the Board of Registry.

*Willis R. Jones,* for John P. Schultheis.

OFFUTT, J., delivered the opinion of the Court.

John P. Schultheis is a voter, registered from the Ninth Precinct of the Fourth Ward of Baltimore City, professing to reside at No. 635 West Fayette Street in that precinct. His wife and family reside at 140 North East Avenue in the Twentieth Precinct of the Sixth Ward, in that city.

On October 7th, 1936, John Philip Hill, the appellant, filed with the board of registry of the Ninth Precinct of the Fourth Ward a sworn declaration that Schultheis was not a qualified voter in that precinct, that he did not reside at No. 635 West Fayette Street, but that he did reside at No. 140 North East Avenue, in that city. On Tuesday, October 13th, 1936, he appeared before the board and offered evidence in support of the declaration, but the board, after hearing evidence for and against the petition, refused to erase Schultheis' name from the registration books. Hill then, on October 14th, 1936, commenced this action in the Superior Court of Baltimore City for the purpose of having that court review the decision of the board of registry. That court, after testimony and a hearing, dismissed the petition. To that ruling the petitioner excepted, and from it he has taken this appeal.

The question presented by the appeal is whether, within the meaning of the election laws, Schultheis is a resident

of the Ninth Precinct of the Fourth Ward of Baltimore City. The appellant contends that he is not, because, he says, Schultheis' legal residence is in the precinct where his wife and family reside. Schultheis contends that he is, because, he says, he not only is engaged in a business at 635 West Fayette Street, but actually resides there, and that he may, under any proper construction of the election laws, have a legal residence apart from his wife and family.

Without stopping to analyze it in detail, it is enough to say that the evidence establishes the facts which follow:

Schultheis is and for many years has been a saloon keeper. He formerly conducted a saloon at 22 Pearl Street, which is also in the Ninth Precinct of the Fourth Ward, in which he has been a registered voter for fourteen or fifteen years. Some three years ago he left the Pearl Street place and opened a saloon and restaurant at 635 West Fayette Street. The license for the Fayette Street saloon was at first in his name, but he later transferred it to his son-in-law, Raymond J. Grund, although he continued to manage the business. Later the son-in-law retired from it, and Schultheis resumed full control, although the license was renewed in the name of Grund.

Notwithstanding the fact that he maintained a home for his wife and family on North East Avenue, Schultheis claims that he himself resided first at the Pearl Street saloon when he was in business there, and later at the Fayette Street place when he removed from Pearl Street. He had a room over the Fayette Street saloon, kept his clothes either there or at a tailor's place "across the street," he slept there, he was "there more than anywhere else," and although he spent a couple of evenings a week with his family, he regarded it as his home. He did that, he said, because the nature of his business kept him up late at night, and "rather than go home" he would "stay up there." He had been registered from that precinct for many years, and the precinct itself is in the same legislative and congressional district and councilmanic ward as the home of his wife and family.

Upon these facts it cannot be said as a matter of law that Schultheis was illegally registered as a voter in the Ninth Precinct of the Fourth Ward of Baltimore City. Apart from the fact that his wife and family reside in another precinct there could not well be any doubt of the soundness of that conclusion. But while it is presumed ordinarily that the domicile of a married man is at the place where his wife and family reside (19 *C. J.* 433), that presumption is rebuttable *(Ibid.)*, for there is no principle of law which prevents a husband from having a legal residence apart from his wife and family.

Although the analogy is somewhat remote, *McLane v. Hobbs*, 74 Md. 166, 21 A. 708, is consistent with the view that a married man may have a residence different from that of his wife and family. In that case Hobbs, a resident of Washington, D. C., bought a house in Frederick, Maryland, and established his wife and children there. He himself continued to work in Washington, and lived there from Monday morning to Saturday evening in each week. He would return to his family in Frederick on each Saturday evening and leave again for Washington on the following Monday morning. After that had gone on for something over two years he applied for registration in Frederick. It was not disputed that his wife and children were permanently domiciled in Frederick, but the court decided the case, not on the ground that the husband and wife could not have separate legal residences, but on the ground that Frederick was his actual home, that he intended to reside there permanently, and that he had no other home.

In *Restatement, Amer. Law Inst., Conflict of Laws*, it is stated: "If a wife lives apart from her husband without being guilty of desertion according to the law of the state which was their domicil at the time of separation, she can have a separate domicil." Section 28. In comment b and c to that section it is stated: "b. If a wife lives apart from her husband without being guilty of desertion, she can retain her domicil, although he changes his domicil." "c. If a wife lives apart from her husband without being

guilty of desertion, she can acquire a new domicil apart from his."

In *Estopinal v. Michel*, 121 La. 879, 46 So. 907, 908, referring to the same principle, the court said: "The place where a man's family lives does not determine his domicile, and still less his residence. The domicile of wife and children follows that of the husband, not that of the husband that of wife and children." And the general principles applicable to such a case are stated in 19 *C. J.* 433, as follow: "The domicile of a married man is presumed to be at the place where his wife or family resides, provided the family residence is a permanent home and not a mere temporary residence for transient purposes. Sometimes this rule is declared by statute. The removal of one's family is always an important, if not an essential, element in a change of domicile. The presumption does not hold where the husband pays only occasional visits to his wife and family, and where a separation has taken place the presumption ceases. This presumption is by no means conclusive, and may be rebutted by facts showing a contrary intent."

The Constitution of the State, article 1, section 1, grants to every citizen of the United States who has been a citizen of the state for one year and of the legislative district or the county in which he may offer to vote for six months next preceding the election the right to vote in the ward or election district in which he resides." The meaning of the word "residence," as used in that section, was considered in *Schaeffer v. Gilbert*, 73 Md. 66, 70, 20 A. 434, 435, and we know of no clearer or more satisfactory definition of it than that there given, where it is said: "In prescribing the qualification of voters and eligibility for office, whether it be governor, judge, attorney general, senator, or member of the house of delegates, the person must be a 'resident' or must 'reside' for the time specified within the state or county. The object in thus prescribing residence as a qualification for the exercise of the right of suffrage was not merely for the purpose of identifying the voter, and as a protection against fraud,

but also that he should become in fact a member of the community, and as such have a common interest in all matters pertaining to its government. The framers of the constitution were dealing with the question of residence for political purposes and which, although analogous in many respects, is not to be understood in the same sense as domicile in law, by which the rights of persons and property are governed. So the question is what is the meaning and what is necessary to constitute 'residence,' as thus used in the constitution? It does not mean, as we have said, one's permanent place of abode, where he intends to live all his days, or for an indefinite or unlimited time; nor does it mean one's residence for a temporary purpose, with the intention of returning to his former residence when that purpose shall have been accomplished, but means, as we understand it, one's actual home, in the sense of having no other home, whether he intends to reside there permanently, or for a definite or indefinite length of time." See, also, *Langhammer v. Munter,* 80 Md. 518, 526, 31 A. 300.

The election statutes (Code, art. 33, sec. 18, as amended by Laws 1931, ch. 121) prescribe in the most careful and complete manner the information which an applicant for registration must furnish as to his residential qualifications before he is entitled to register as a voter. But there is nothing in those statutes to justify the inference that they are intended to restrict the privilege of the citizen to select in good faith his legal residence. Their manifest purpose is not only to insure an orderly listing of the voters, but to prevent fraud. In construing their terms, therefore, the court in such cases as *McLane v. Hobbs, supra, Schaeffer v. Gilbert, supra,* and *Langhammer v. Munter, supra,* has given them a meaning designed to satisfy that obvious intent. So when, in *Shaeffer v. Gilbert,* the court said that one's voting residence is "one's actual home, in the sense of having no other home," it had in mind the fact that one is more likely to be known, and may more readily be identified, in the place where his actual home is, than in some other place where he

appears rarely, casually, or occasionally, even though his connection with it through domestic or other like relations would ordinarily be consistent with the conclusion that it was his residence.

The force of that reasoning is well illustrated by the facts of this case. On the occasions when Schultheis visited his wife and family at North East Avenue he arrived late at night when few persons were abroad, and he left early in the morning before many people were astir. Consequently neither the private detectives, nor the neighbors of the Schultheis family on North East Avenue called for the appellant, saw or knew anything of Schultheis at that home, although his neighbors at the Fayette Street saloon knew him well and saw him frequently. His Fayette Street neighbors would therefore be better able to identify him as the John P. Schultheis registered as a qualified voter from the Fourth Ward or Baltimore City, than the neighbors of his family on North East Avenue, who never saw him, and did not know him. He lived at the Fayette Street place, slept there, ate there, for years was registered as a voter in that precinct, had been elected to the State Legislature as a registered voter from that precinct, and he himself regarded the Fayette Street place as his real home. Under those circumstances it cannot be said that he was fraudulently registered from 635 West Fayette Street, or that that was not his legal residence. Appellant attached some weight to the fact that Schultheis was not listed in the police census as a resident at 635 West Fayette Sreet, but was listed as living at North East Avenue; but that circumstance has little probative force. He had had nothing to do with the compilation of that census, and indeed it did not appear that he knew anything of it, nor does it appear where the officer who secured the data got his information, and it is undisputed that Schultheis was at that time registered from 635 West Fayette Street, that he had a room there in which he slept, that he was actively enaged in managing the business there, and that he was constantly about that place.

It was also shown by the appellant that the liquor

license for the saloon was issued to Raymond J. Grund, while Schultheis actually owned it. The purpose of that evidence is obscure. Assuming that Schultheis, in violation of the liquor laws, permitted a license to be issued to Grund for a saloon which he owned and conducted, that circumstance could not possibly tend to prove that Schultheis did not live there. The proceeding was not to try whether Schultheis had violated the liquor laws, but to test his right to register as a resident of the Ninth Precinct of the Fourth Ward of Baltimore City.

Finding no error in the ruling involved in the appeal, the order of the trial court was affirmed in the *per curiam* order heretofore filed.